SAMUEL CRANWELL *v.* SHIP FANNY FOSDICK, MASTER AND OWNERS.

Where flour was stowed upon a vessel, either improperly, or in such proximity to an offensive and
  injurious oil as to suffer damage, and it was shown that the common carrier had been put on his
  guard, as to the danger from such oil to the flour—*Held:* That he was responsible for the damage
  sustained by the flour.

The first obligation of the common carrier is to indemnify the shipper for the loss or injury of goods
  committed to his charge, unless occasioned by accidental and uncontrollable events.

A custom is without force in opposition to a positive law.

APPEAL from the Fifth District Court of New Orleans, *Eggleston, J.*
*Gaither & McPheeters,* for plaintiff and appellant. *Singleton & Clack,* for defendants and appellees.

DUFFEL, J. This suit commenced by attachment, and resulted in a judgment in favor of the plaintiff for $1,130 75 ; the defendants appealed.

The plaintiff charges that his agents in New Orleans, shipped, on the 30th of September and the 3d of October, 1857, on the ship Fanny Fosdick, then in this port, and bound on a voyage to New York, in good order and well conditioned, 600 barrels of flour, to be delivered to *Frost & Forest* of New York ; that the flour was stowed with Breckenridge coal-oil, and was thereby seriously damaged, and rendered unmerchantable and unfit for family use, as it was thoroughly impregnated with the smell of the oil, and that the same was sold at auction, for account of whom it might concern, at a loss of $1,582 75, including expenses, and the unwarrantable delay of said ship in leaving the port of New Orleans.

The defendants pleaded the general issue.

The bills of lading contain the limitation "weight and contents unknown," and it is admitted that 48 barrels of Breckenridge coal-oil were stowed in the ship on the 9th, and 150 barrels on the 23d of October, 1857.

The evidence shows that the vessel was well ventilated, and that her cargo was well stowed. *William Thompson,* a marine surveyor of New York, who examined as such the cargo, says " the barrels of oil were stowed in the ground tier of the ship, from the main hatch foreward, for about twenty feet; on top of the oil were barrels of molasses and sugar ; the flour was stowed, foreward and aft, in the lower hold by itself, there was no oil under it or on the top of it. The oil was from twenty-five to thirty feet from the flour. The stowage of the cargo was good and proper. About half of the flour was between decks. Some little of the flour was stained by the sweating of the vessel, and some little by the sea water." Although all the witnesses do not agree as to the exact position of the oil and flour, they nevertheless all declare that the oil and flour were placed apart from each other, the distance varying from 25 to 50 feet.

There also appears to be a diversity of opinion as to the damaged condition of the flour. The barrels were externally in good order. *Hicks,* one of the witnesses of the plaintiff, says, that the flour to him " tasted pure, fresh and good." *Dwyer* and *Cormier,* defendants' witnesses testify that the flour came out in good order, free from smell. The weight of evidence is, however, the other way, and we have no doubt that the flour was more or less impregnated with the smell of the oil.

One of the witnesses says, that he had some of the flour made into bread, and that the bread retained the smell and taste of the oil, and that the flour could

only be useful for starch manufactories; and the general opinion is, that the flour was unmerchantable. The consignees complained to the master and agents of the ship, that this flour was damaged before it was received by them. It was thus received on the 12th of January, 1858, and was sold at auction "for account of whom it might concern, on the 21st January, 1858 : 100 barrels at $5 25 per barrel, 100 barrels at $5 12½, and 400 barrels at $5 per barrel.

It is also established, by the evidence, that this ship was a general ship, engaged in the business of carrying general cargoes for freight, and that it is usual to take in such ships sugar, molasses, flour, oil, and other articles of a ·volatile character which are stowed together in the hold, unless objection be made; and that no objection was made in this instance; that this ship, and other ships, have carried such cargoes without causing any injury to the flour, and some of the witnesses argue that this is a custom well known to shippers of flour. On the other side such usage is contested by other witnesses; and it is in proof that this very oil had been refused on another general ship in the same trade, lest it should have damaged the other cargo, and that "Fosdick was advised in a friendly way not to take the oil, as witness thought it would damage the other portion of the cargo." Another witness says : "application was made to me, during last September, to take on a vessel for which I was agent a quantity of Breckenridge coal oil, which I refused to take, because I felt certain that it would damage the other cargo I had on board the ship, which was principally flour and wheat."

The witness, Britton, says "that he does not think that flour would be injured by the odor of this oil permanently, because it passes off rapidly," but it appears that the smell is very offensive, and that flour is easily injured, by being put in contact with other objects.

Had not the flour been seriously affected, its exposure to the action of the atmosphere, from the 12th to the 21st of January, would have restored it to its natural state; and had it been properly stowed it would not have been affected, according to the opinion of the witnesses who assert that general ships carry flour and coal-oil without any injury to the former. We are however of opinion, from the whole testimony, that Breckenridge coal-oil is offensive and injurious to flour, and that the common carrier was put on his guard, and is therefore responsible for the loss incurred by his neglect and want of foresight, in not placing the flour and oil in such a manner as not to expose the flour to the contagion of the oil. Besides, the flour was received in the ship several days before the oil.

We cannot give our assent to a custom which will relieve the common carrier of all responsibility towards the shipper; for we consider that his first obligation is to be held liable for the loss or injury of the goods committed to his charge, unless occasioned by accidental and uncontrollable events. C. C. 2725; *Brousseau* v. *Ship Hudson*, 11 An. 428, and the authorities therein cited. Nor will we recognise the force of a custom in opposition to a positive law. C. C. 3 ; *Tyson* v. *Laidlaw*, 18 La. 381 ; *Ledoux et al.* v. *Armor*, 4 R. 381. Besides the authorities cited and more particularly the cases of *Baxter* v. *Leland*, 1 Blatchford ; C. C. R. 525 and *Nettleton* v. *ship Fanny Fosdick*, recently decided by Judge Betts, in the United States District Court of New York, present a different state of facts in several important particulars. Here we have a real loss, caused either by improper stowage, or by the proximity of the oil and flour, with a full knowledge, on the part of the owner, of the injurious ·effect which the oil would produce on the balance of the cargo, to which must be added the fact that the 600 barrels of flour had been received by the ship before she had taken any oil.

The District Judge allowed $1 75 for each barrel and $82 75 for the expenses incurred; we think that a lower estimate, should, under the evidence, have been taken. The witnesses who speak of the flour market at the time this flour was delivered quote it at $6, $6 75 and $7; taking $6,50 as the true value, we have $3,900; deduct gross proceeds of the flour sold at auction $3,033 50, difference $866 50, to which add expenses $82 75—total $949 25.

It is, therefore, ordered, that the judgment of the lower court be reversed; and it is further ordered, adjudged and decreed, that the plaintiff do recover of the defendants *in solido* the sum of nine hundred and forty-nine dollars and twenty-five cents, with legal interest from judicial demand, say 13th March, 1858, till paid, and the costs of the lower court, and with privilege on the property attached. It is further ordered, that the costs of the appeal be paid by the plaintiff.

LAND, J., absent.